Good morning ladies and gentlemen. The first case this morning is Victims of the Hungarian Holocaust versus Magyar, the Bank. Mr. Leon. Good morning. My name is Jeff Leon from Quantum Legal, and I'm representing the plaintiffs in this matter. I've actually reserved 12 minutes of argument for myself. My co-counsel Mr. Battaglia has three. I'm here today to talk about the district court's application of the expropriations exception of the Foreign Sovereign Immunities Act in two particular ways. The first is whether the act applies at all as the district court was presented with substantial authority that for a discriminatory taking, a violation of international law and therefore subject matter jurisdiction under the FSIA exists with or without an offer of just compensation. The second area that I'm going to explore is the district court's failure to apply comment F of section 713 of the restatement, which this court in its prior opinion in abolish directed the district court to apply, in particular concerning the issue of unreasonable prolongment of the availability of the remedy and whether or not Hungary firmly denies responsibility for the expropriation. The place I want to start, however, is whether or not this exhaustion discussion is even a requirement. I know what this court said previously in the abolish opinion. However, we presented four critical authorities to the district court and in our briefing to this court, establishing that for a discriminatory taking and to be clear, nobody is disputed that this was a discriminatory taking. The real and personal property of the Jews of Hungary is the definition of a discriminatory taking. There are four authorities which suggest that a discriminatory taking violates international law without any requirement for an offer of just compensation. The first is the legislative history of the Foreign Sovereign Immunities Act itself. And we cited that in our brief and it says that a taking violates international law if it is done without prompt payment of the prompt adequate and effective compensation required by international law or is arbitrary or discriminatory in nature. Now, all that's required to establish subject matter jurisdiction under the FSIA is that the property be taken in violation of international law. It's clear that under international law for a non-discriminatory taking, the taking does not violate international law until no offer of just compensation has been made. That is not the case for a discriminatory taking and I think we can understand the reasons why. For example, if the Hungarians said to the Jews, you cannot own any real estate in Hungary. We'll pay for it, but you can't own it. And you can't own a business. We'll pay for it, but you can't own it. And by the way, we'll pay you for it, but you can keep all the money in this country and we're going to control how you use it. In other words, basically we'll use it for yourselves. That would violate international law because international law recognizes you cannot use the authority of the state to impoverish an ethnic group or minority, particularly as part of a genocidal campaign. I thought Abelez was the first case that recognized this exception to the domestic takings rule under international law. It was not, Your Honor. Casseray v. Kingdom of Spain actually preceded this case and Casseray actually considered this question of discriminatory versus non-discriminatory expropriations. And if I could direct the court to footnote 25 of Casseray, which says that, and it goes through the Greenpeace and the Millicom cases, which this court cited previously, which are non-discriminatory taking cases. And it notes that those cases require exhaustion of post-deprivation remedies because there cannot be constitutional injury until a state fails to However, a taking may violate international law when it does not serve a public purpose or is discriminatory in nature. The kind of taking that Casseray has pled for purposes of jurisdiction in this case, as well as when it is not accompanied by just compensation. And in the body of the opinion itself, they go through the analysis and they distinguish Millicom and Greenpeace and interhandle. And note that those were not discriminatory takings cases. And they explicitly state on page 1035 that Casseray's jurisdictional theory is different than Millicom and Greenpeace. However, he asserts that the taking was in violation of international law because it was part of Germany's genocide against the Jews. Therefore, this second prong of the takings exception didn't apply for it to violate international law. And that's really all we're trying to decide here. This is a jurisdictional question. And the question is whether or not a U.S. court has jurisdiction over these sovereign entities. And the language of the takings exception is clear. This court does if the taking violated international law. There was no argument by the appellees on this issue except to argue law of the case. There was no argument that the authority that we cited doesn't in fact establish definitively that a discriminatory taking violates international law, period. We also offered additional authorities. The restatement. The restatement section 712 states that a state is responsible for injury resulting from a taking if it is accompanied by provision for just compensation. If you're relying on section 712, I think you just skipped a few critical words. The taking of the property of another state. Exactly. Right. And we discussed this in the prior ruling, Your Honor, and this question. But 712 then really doesn't help you very much, does it? Well, it does because it mirrors the language of the legislative history of the FSIA. And it is a place where the taking is discussed. And as we have pled in this case. And as applied only to taking the property of a national of another state. And that's not what we have here. Well, actually, we pled that is what we have here. Because if you recall, the pleading of the case and the true facts were that the Jews were considered no longer to be citizens of Right. That issue does not require citizenship. I'm sorry. The domestic takings rule generally does not require citizenship. It does and it doesn't. If I recall correctly from the prior abolition. If you didn't like the prior decision, you could have filed a petition for rehearing. If you want to re-argue those issues, you can. Or you can focus on what's new. Okay. What's new is some of the additional authorities that we cited. Such as the statement by Mr. Feldman, who was a drafter of the Foreign Sovereign Immunities Act, who stated, and we cited this in our briefs, that the executive drafters of the Foreign Sovereign Immunities Act in Congress would never have dreamed of allowing any such defense in an action brought under Section 1605A3, which is the expropriations exception. Did Mr. Feldman contemplate domestic takings? I don't know. He didn't. It's not apparent in his statement. It's not apparent in his statement. Thank you. What also is new is the Republic of Argentina case, which was decided just a few months ago. And Judge Hamilton, you yourself cited it, I believe, two days after the opinion came out. And we think there are two significant things from that foreign policy implications of a U.S. court exercising jurisdiction over this case, given the rather large magnitude of the potential damages. And that was exactly an argument that the State Department and the Republic of Argentina made. Argentina went to international markets, financial markets, and essentially waived every shred of sovereign immunity it would undermine international comedy, which is exactly a concern that the State Department and the Republic of Argentina have. And I think that's an entirely different situation. One could argue that is true on the facts, but I believe that the language that Justice Scalia used in the opinion is not quite so limiting. Because what was argued to them, to the court, was that the effort to conduct this post-judgment discovery would undermine international comedy, which is exactly a concern that this court expressed previously. And that it might provoke, quote, reciprocal adverse treatments of the United States in foreign courts, which is also a concern that this court expressed explicitly previously. And what Justice Scalia said on behalf of the majority, a pretty strong majority of the court, was these apprehensions are better directed to that branch of government with authority to amend the act, which, as it happens, is the same branch that forced our retirement from the immunity by factor balancing business nearly 40 years ago. Now I recognize that the posture of the Republic of Argentina is different. It was in a post-judgment context. The bonds that Argentina expressed, the concerns expressed by the appellants in the Republic of Argentina case were identical to that of the court. The other aspect of the Republic of Argentina case goes to this issue of whether or not we can read in an exception to the FSIA as far as exhaustion is concerned. The key word there, which goes a long way towards citing this case as comprehensive, and you're citing the legislative history of the FSIA in saying that it's comprehensive. We have used that term often and advisedly to describe the act sweep and any sort of immunity defense made by a foreign sovereign in an American court must stand on the act's text or it must fall. And the act's text says that taking in violation of international law is discriminatory and it doesn't require just compensation. But I want to talk about the unreasonable prolongment because we understood what the court said, that the plaintiffs are coming late to the game and that you ought not count the period of Soviet rule. But the court said that Hungary and 1991, 1992, and 1993 came up with so-called compensation acts, which the district court ruled were inadequate and unavailable for obvious and understandable reasons. And we're standing here 21 years later. That's unreasonable prolongment. And I would direct the court to the Hickenlooper Amendment, which suggests that in the context of evaluating whether an offer of just compensation is made by a foreign country, six months is considered timely. So even if we look at contemporary Hungary, it's a lot more than six months. And not only that, but that constitutional court precedent has been eviscerated by the new Hungarian constitution, which eliminated all prior precedent. So Leon, is the idea that Hungary had to reach out to the plaintiffs in order to remedy or that it simply had to make its courts open? Your Honor, I believe that Hungary would have to reach out. If you look at the language of the FSIA and the restatement, it says, or offer of just compensation. Offer of just compensation. I believe that there is some incumbent burden on Hungary, and especially when it's undertaken that effort. If it never undertook any effort and somebody went to court and tried, maybe you could have an argument. But here, they've said, this constitutes just We'll try three times in 93. And those efforts were found to be inadequate. I apologize, Your Honor. That's right. It's your time. Yeah. In short, we believe that no exhaustion should have been required as a matter of the language of the statute and also under the exceptions that would have been futile and unreasonably prolonged. Thank you. Mr. McCall? May it please the Court. Kenneth McCallion, I've been asked briefly to address the issue as to why it would be entirely futile to require the plaintiffs to return to Hungary to pursue claims there. It would be an entirely futile gesture. I'd like to point out just at the onset that every other country in Europe that we're aware of that had some complicity, aided and abetted, or otherwise participated in the situation in Hungary is completely the opposite. The Hungarian government is in holocaust denial. It's in holocaust denial. And it absolutely denies any that the Hungarian government ever had in the genocide of its own people, the Hungarian people in 1944. It has done that in several very distinctive ways. Number one, the new constitution, the constitutional amendments of 2011 and 2012 in the preamble make it explicitly clear that Hungary, as a matter of fact, it's not true, but they say in the It's enshrined in the constitution. The constitution also makes it a crime to challenge the dignity of the Hungarian nation and anyone who challenges the issue in the preamble as to responsibility, the claimed non-responsibility by the government for the holocaust is subject to criminal prosecution in Hungary. We have competing affidavits from different experts in Hungarian and international law reading, if I may be colloquial about it, different tea leaves from different provisions in the evolving Hungarian constitution and other laws. In essence what we've got are experts trying to predict what might happen if the plaintiffs were to seek remedies in modern day Hungary. Is there any evidence before us of actual failures of the Hungarian courts to give fair treatment to holocaust victims who have sought relief? No, your honor, because the record below is completely, completely inadequate in that regard. There was never any evidentiary hearing. Have you gathered any such evidence that was submitted to the district court? We have some indications that there have been some disputes over art ownership that at least some have been resolved in favor of families whose property was taken. Let me tell you what I have in mind here. Go back to the civil rights era in this country as the federal courts evolved a number of doctrines that were used to step in and in essence exercise jurisdiction and not to require people to go to the state courts, particularly in the Jim Crow South. The record of those courts hostilities to civil rights claims was undeniable. Here, as Hungary has been changing and evolving, I guess I'm looking for some kind of evidence that those courts have in fact been closed to people who have sought relief. The reason why it's closed, it's a very different legal system than in our country. The government itself, due to the breakdown of the independence of the judiciary, the government ruling party, which controls the government, controls the dockets, whether you can file a complaint or not. That's why there is a dearth and a paucity of any denials of any claims because the claims cannot be accepted. I understand that argument. Is there any evidence anybody has tried? Yes. Systematic failures. Yes, absolute systematic failures. Where do we see that? Well, the Chief Judge Baca, who was recently fired by the government, spoke out about the constitutional amendments and the failure to keep the courts open as a separate branch of government. His complaints could not be heard in any Hungarian court. He had to leave Hungary and go to the European Court of Human Rights to bring his claims, which have so far accepted his claims and acknowledged and admonished Hungary for the breakdown of the rule of law and the failure to even accept on its dockets any claim. Well, to follow up on Judge Hamilton's question, is that part of the record in this case? His comments in the European Court of Human Rights. I believe Chief Judge Baca's comments were certainly part of what our expert considered in reaching his conclusion that there is no independence of a judiciary in Hungary. And moreover, the situation has deteriorated since Chief Judge Baca was fired. There has been a recent memorial, so-called memorial, unveiled by the government just within the last few months showing the German imperial lion raping, despoiling poor Hungary as a victim. It is absolute revisionist history. It's been rejected by all scholarly commentators. It's been rejected by the European Union. The U.S. government is on record as having denounced Hungary for Holocaust denial, denying any complicity by the Hungarian government. Only recently, within the last couple of months, the U.S. Commission for the Preservation of America's Heritage Abroad, Leslie Weiss, herself a daughter of a Hungarian Holocaust survivor of Auschwitz, admonished the Hungarian government and warned it, as many others, Hillary Clinton, others in the U.S. government have warned Hungary not to distort history. Hungary, before the Germans ever occupied it, became greater Hungary. How did it become greater Hungary? By gobbling up the surrounding portions. In paragraph 77 through 88 of our amended complaint, it outlines with great specificity how on cables from the State Department, our government during the war said, you, Hungarian government, if you do not back down, if you continue to be complicit, aid and abet the German war machine and its abominable, genocidal policy, you will be held accountable after the war. That was 1944. Seventy years. Counsel, I'm going to ask you to wrap up your portion of this. Yes, Your Honor. Seventy years has passed. Our plaintiffs, the youngest ones, are now in their seventies and their eighties. There's not many left. Many have died without any recourse to justice. They came to the U.S. shores from Hungary, many to never return and never want to return to Hungary. And they asked the U.S. courts to hear their claims, violations of international law. I can tell your honors that they can find no justice in Hungary. They can't even find a lawyer to stand up and file a claim in Hungary for them. He'd be subject to sanctions, disbarment, and worse. Thank you, Counsel. There was recently a debate in the Hungarian- Thank you, Counsel. Yes, sir. Thank you very much. We would ask the court to respectfully remand to the district court for a full hearing where there's absolutely no record whatsoever on this issue and the court's conclusion that this is all speculation. Thank you very much, Your Honor. We'll add five minutes to their time and we'll get five additional minutes for you as well. May it please the court, Conrad Kelter on behalf of the Hungarian National Railways. Your honors, there's not- the only evidence in the record as to how the plaintiffs may be treated if they bring these claims in Hungary is the evidence that we submitted which shows that there were Holocaust survivors that brought claims for restitution of property and for paintings and in fact prevailed in the Hungarian courts. So are there any other survivors who've been able to bring civil litigation claims for restitution besides the taken artwork? Your Honor, we've looked and we have not found any cases where survivors have brought claims. However, I think just a recent event which we referenced in our brief, which was an article written by a plaintiff's lawyer who brought claims in the D.C. District Court exactly like the claims that were brought by these plaintiff's attorneys with regard to takings during the Holocaust. That plaintiff's attorney sought the assistance of the Hungarian courts to help collect evidence and to take the deposition of a war camp guard. Not only did the Hungarian court provide assistance to that plaintiff's attorney, but that plaintiff's attorney noted in that article, and he went to Hungary, that the court provided the assistance that he asked for. He was not discriminated against, he was not arrested, and in fact the Hungarian court went out of its way to assist that plaintiff's attorney in trying to collect the evidence that he was seeking. So the only evidence in the record shows that if they go to Hungary and if they try to file their complaints in Hungary, they will be treated fairly. Let me talk about the other evidence in the record about how the plaintiffs may have been treated had they filed their cases in Hungary. The plaintiff's own expert in his affidavit admitted, just as the defendant's experts had said, the Hungarian court system, at least prior to 2012, was fair and well-functioning. Nothing has changed since 2012 to affect that. In fact, when you look at the new Hungarian constitution, the new Hungarian constitution not only guarantees that everyone shall be equal under the law, but it also guarantees that you're entitled to a fair and impartial and independent court in deciding your case. Well, can the current, under the new constitution, can the current Hungarian state be held legally responsible for crimes committed against Hungarian Jews during World War II? I believe they can, Your Honor. It's not saying that they may have a case. They would have to prove their case in the court, but there's nothing in the constitution that would prevent a Holocaust survivor from bringing claims to the court. There would be no claims for either restitution of property or damages for property having been stolen. And in fact, the last time we were here, I talked about the 1947 treaty and the obligations of the Hungarian state under that treaty. And when you look at it, and that treaty is still in effect, and in fact, when you look at the constitution of the Hungary, it specifically says that Hungary must adhere to international law, and it also must adhere to international law. It must adhere to the laws of the European Union that it joined. So I believe that they can bring such claims, and if they're successful, just as those plaintiffs that brought the claims for restitution of property or restitution of art prevailed, then they can bring those claims and get compensation from the government. So what are we to make of the firing of Baca? I think that's his name. And the discussion in the expert report. I think that what's important about what has been going on with the government of Hungary, you need to dig down into the experts' affidavit, and the first thing that you see is their plaintiff's experts admits that the current government is not anti-Semitic. And so there may be issues, just as there are in this country, about judicial appointments and those people to be on the bench, but when you actually look at the new constitution, what the new constitution says is that judges cannot be instructed by the government in how they carry out their duty, and it says that judges cannot be members of political parties. And they cannot be involved in political activities. So while there may have been disagreements about whether or not the chief judge was the right person to lead the current Hungarian judiciary, I believe that's an issue, just as much as in this country in deciding judges, is somebody qualified or not qualified, but it has nothing to do with suggestions that somehow the government of Hungary is anti-Semitic. And somehow plaintiffs, if they were to bring their claims in Hungary, would not be treated fairly. So your feeling in terms of the preamble, which says that we proclaim the self-determination of our state lost in March of 1944, restored in 1990, that that is the day we consider the beginning of the new democracy, you don't think this distance is Hungary from its responsibility for Hungary? No, I don't, Your Honor. I think that preamble, if you were to look at the constitutions of many of the other European countries, have similar type language. All that is saying is that there was a period of time when others took control of Hungary. It doesn't disclaim responsibilities that the Hungarian government may have had under international obligations, including the 1947 treaty with regard to responsibilities of takings that took place during Hungary. Just a couple of other things that I wanted to note with regard to Hungary today. First of all, Hungary has outlawed the denial of the Holocaust. It is a crime in Hungary to deny that the Holocaust occurred. Second of all, in terms of the Hungarian courts, they have prosecuted Hungarian judges. They have prosecuted Hungarian concentration camp guards criminally. So, and again, I think this is all evidence to show that the current government is not only anti-Semitic, but that these plaintiffs can bring their claims in Hungary and will be treated fairly. Counsel, would you, I think you and your experts have told us that there are no statute of limitations problems with these claims. Is that right? I believe that's, I believe what we've said, Your Honor, is that the statute of limitations is complicated. But as the plaintiffs themselves say in their briefs, and as the preamble of the constitution speaks to the fact that there is no statute of limitations for the Holocaust era crimes. I think also when you do an analysis of the Hungarian law regarding statute of limitations, depending on the type of claim that the plaintiffs make, it's a little bit more complicated. But as the plaintiffs may or may not bring, there's a 30-year statute of limitations that may well, that was in all likelihood told during the communist era, so it did not, would not, the 30 years would not begin to run until 1989. So. Are you, are your clients reserving a right to assert any statute of limitations defenses if this case were pursued in Hungary? The only statute of limitations rights that we would reserve, Your Honor, would be any statute of limitations that may have run before they filed their complaints in this country in 2010. I don't understand what you just told me. That sounds like a pretty big reservation.  Your Honor, if, for instance, there was a particular claim that they brought and it had a five-year statute of limitations, and they waited 70 years to bring that claim, then I think that it would be fair to allow Hungary to argue that the statute of limitations on that particular claim may have run. I don't think that makes it futile. Well, I don't understand what you're trying to reserve, then. You've told us that. But, Your Honor, let me make it be simple, then. You've told us, unless I've misunderstood, that statutes of limitations on Holocaust-related claims, in essence, don't count, don't apply to such claims. Your Honor, let me be simple and clear, then. Were they to bring these claims in Hungary, Hungary is not going to assert a statute of limitations defense with regard to the plaintiffs' claims. Your clients are not going to assert such a defense. That is correct, Your Honor. What about a defense that the claims are barred by the existence of earlier remedial schemes? Statutes of compensation, the treaties, etc. Well, Your Honor, I think that there are various types of claims that may have been barred because of the compensation statute, but there are certainly in-written claims for recovery of property, or if you were not entitled to claim under the Compensation Act, that claim may be barred because you didn't bring it at the time. But let me just talk briefly about those compensation statutes, because I believe Mr. Leon talked about unreasonably prolonged. I think this Court addressed that issue in its last opinion, but I would note that the compensation statutes that were enacted in 1992 and 1993, the Second Compensation Act and the Third Compensation Act, were enacted well before the most recent compensation statutes in Germany and Austria in those settlement programs. I would also note that there was over $55 million in compensation paid out just in the Second Compensation Act alone, and there were hundreds of thousands of individuals that applied to these compensation statutes. So it's not as if these were compensation schemes that weren't well publicized, that weren't noticed to everybody to be able to claim under these compensation statutes. Just a couple of things, unless there are more questions with regard to remedies in Hungary. On the exhaustion issue, I think that this Court hit the nail on the head last time when it talked about exhaustion being a well-known requirement under international law. The Supreme Court's most recent case in the Argentina case doesn't change anything. In fact, that's really the wrong Argentina case to look at, the right Argentina case to look at in determining how to interpret what international law means as used in the FSIA as a weltover case. That's a case that was also written by Justice Scalia, and there the issue was what did the term commercial used as in commercial activity in 1605A2. So similarly, what you look at here is in 1605A3, what did Congress mean when they used the term international law in 1605A3, and it's perfectly appropriate to do, as this Court did, to look outside what did the term international law mean when Congress used it in which would have been the second one in effect at that time had an exhaustion requirement. So I don't think that there's any dispute with regard to the need to exhaust local remedies before you can state a violation of international law. Given the language of 712, however, which does distinguish between discriminatory takings and other kinds of takings made without compensation, why don't plaintiffs have a pretty viable argument? Well, I think you're... I'm sorry, Your Honor. Go ahead. I think what you need to do is look beyond just the language of the restatement itself and look at the comments to the restatement, and if you look at comments B, C, and D of section 712, those compensation is a requirement for any type of taking, be it discriminatory or non-discriminatory for a government purpose or a non-government purpose. And in fact, I think if you look at comment F to section 712, there is a suggestion that a discriminatory taking or a taking for a non-government purpose with just compensation may well not be a violation of international law. So I think that the plaintiffs are just wrong in terms of how they're trying to read restatement section 12 in terms of the need for just compensation to establish a taking in violation of international law. And then that then requires exhaustion. You first have to try to seek your local remedies in Hungary. In this case, they would have to seek their local remedies in Hungary before they can have stated a violation of international law. Unless Your Honors have any other questions... What kind of showing, counsel, do you think would show that remedies are futile? Well, I think what the plaintiffs would have to show, Your Honor, is that someone had gone to Hungary and filed a case and the case was thrown out for discriminatory reasons or that they weren't given a fair opportunity or that the judge somehow treated them unfairly in that situation. And there's just nothing in the record to suggest that that would be the case. I think I would also point out that the mere fact that the plaintiffs now 70 years later file a case in Hungary and for some reason would not prevail, that doesn't mean that somehow the remedies in Hungary were inadequate or it would have been futile to have gone to Hungary and filed a suit 20 years ago or 30 years ago. So, Your Honor, again, unless the panel has any other questions, we'll rest on our papers and we would just ask that the Court affirm the District Court's decision. May it please the Court, just a few quick comments in rebuttal. It shouldn't be surprising that the Hungarian government would defend its legal system, but they're the only voice defending its legal system. And we have to put the name of Putin on the pesht. He has expressed his admiration for Putin and he has changed the Constitution a number of times since this Court ruled. What do we make of Dr. Halmai's affidavit that says in essence the legal system was working pretty well until about 2012? Until about 2012. That may have been true. Your expert says it was true, correct? Yes, he does. The question we have, though, is the Court's opinion came out in 2012 right at the time, right before these significant constitutional changes went into effect. Hungary, this Court noted, is a modern Western democracy in 2012. In 2013, it found in the Venice Commission report, which we cited, the rising anti-Semitism and the rising right wing and the way that President Orban has shifted both sides of the fence to kind of try to play both ends to preserve his own viability. It may be true that there's no statute of limitations against crimes committed against the Hungarian people, but if you look at that, that's against the Germans and the Russians for what they did to the Hungarian people. They don't admit responsibility for having committed the Holocaust, and in fact, the crime against Holocaust denial does not prohibit the Hungarians from saying it wasn't us, it was the Germans that did it. How long do you suppose it would take you to find out if you went to Hungary to learn that you were not going anywhere? It would take a while, Your Honor. It would. As Mr. McCallion indicated, you're not in control of your own case and your own docket. They can never assign a judge, and again, there's no judicial independence. It's a politically controlled outcome, and it cannot be forgotten that not only is there a risk of prosecution, and Your Honor, you noted there's competing affidavits. There's no finding of fact from the district court on whether or not, in fact, the plaintiffs do or don't. I don't know how you could make a finding of fact about that, counsel. What you've got are competing speculative opinions. You could hear some evidence and evaluate the credibility of the experts and make a decision. That's what we do all the time with speculative expert opinions in litigation on matters that are admittedly far less esoteric than that, but there's one more aspect. Loser pays. That's true in many parts of the world. It is, but when you go in under these facts, under the cloud of a constitutional system that's been condemned by the Venice Commission and the European Union, with its noted lack of judicial independence, with its current efforts, and this is an ongoing situation, to erect statues that rehabilitate and recognize that the Hungarian people didn't do anything after the Germans came in, that the Germans didn't tell them to do, and that they weren't responsible for it, to send these elderly people, these Jewish survivors who were traumatized by what happened to them, into that environment to experiment as to whether or not the remedy will work, I would submit is fundamentally not only unfair, but it's not required by international law because the taking was discriminatory. What's the closest parallel, Mr. Leon, to this case? You're asking, you want to use civil litigation in the United States to pursue liability against the foreign government for events that occurred in that foreign nation three generations ago. What's the closest parallel? Cassaray. Cassaray was civil litigation against the government of Spain for events that occurred during World War II, where property was discriminatorily expropriated. What kind of a scale was that case? The scale? Yeah, I'm trying to remember. It was an artwork case, Your Honor. Individual plaintiff? Yeah, individual plaintiff. But again, I don't believe that these questions of international law should turn, nor do they in the text turn on whether you have a single plaintiff asserting a few million dollars in damages or a large class action asserting substantially more than that. The violation of international law, if anything, is enhanced by the scale of what is being sought, not decreased. Your time has just expired, so you can wrap up. I'm sorry. Your Honor, we believe that exhaustion isn't required here as a matter of law and ought not be required as a matter of discretion. Hungary is not a modern democracy. There's really no debating that. There is no judicial independence. We've cited ample authority that even the recent changes in the Constitution that were intended to try to make the European Union feel better weren't effective. And if you have any doubt at all, you should send it back to the District Court and make some findings of fact so that you can evaluate it based on a proper record and a proper application of the Abusive Discretion Standard. Thank you. Thank you. Thanks to all counsel. The case will be taken under advisement.